**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **MARIA L. PORRAS,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No.  3:18-CV-2870-BH** |
| | § | |
| **ANDREW SAUL,** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | **Consent[1]** |

## MEMORANDUM OPINION AND ORDER

Based on the relevant filings, evidence, and applicable law, the Commissioner's decision is

**AFFIRMED**.

## I.  BACKGROUND

Maria P. (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social

Security (Commissioner)[2] denying her claim for disability insurance benefits (DIB) under Title II

of the Social Security Act.  (*See* docs. 1; 21.)

### A.  **Procedural History**

On February 6, 2012, Plaintiff filed an application for DIB, alleging disability beginning on

April 1, 2011. (doc. 14-1 at 322-25.)[3]  Her claim was denied initially and upon reconsideration. (*Id.*

---

[1]By consent of the parties and the order of transfer dated January 16, 2019 (doc. 18), this case has been transferred for the conduct of all further proceedings and the entry of judgment.

[2]At the time this appeal was filed, Nancy A. Berryhill was the Acting Commissioner of the Social Security Administration, but Andrew Saul became the Commissioner of the Social Security Administration on June 17, 2019, so he is automatically substituted as a party under Fed. R. Civ. P. 25(d).

[3]Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

at 158, 167.)  Plaintiff requested a hearing before an Administrative Law Judge (ALJ), and personally appeared and testified on September 23, 2014. (*Id.* at 52-75.)  On January 16, 2015, the ALJ issued a decision finding her not disabled and denying her claim for benefits.  (*Id.* at 116-33.) Plaintiff timely appealed the ALJ's decision to the Appeals Council.  (*Id.* at 232.) The Appeals Council granted her request for review on May 5, 2016, vacated the ALJ's decision, and remanded the case for further consideration. (*Id.* at 139-43.)

On remand, the ALJ conducted another hearing on June 7, 2017, and Plaintiff personally appeared and testified. (*Id.* at 76-97.)  On October 25, 2017, the ALJ issued a decision again finding her not disabled and denying her claim for benefits. (*Id.* at 28-40.)  Plaintiff timely appealed the ALJ's decision to the Appeals Council. (*Id.* at 319.)  The Appeals Council denied her request for review on June 29, 2018, making the ALJ's decision the final decision of the Commissioner. (*Id.* at 6-9.)  Plaintiff timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (*See* doc. 1.)

## B.    **Factual History**

### 1.    **Age, Education, and Work Experience**

Plaintiff was born on September 5, 1970, and was 43 years old at the time of the first hearing before the ALJ.  (doc. 14-1 at 57, 322.)  She had a limited education and could not communicate in English.  (*Id.* at 57.)  She had past relevant work experience as a package sorter, assembly line worker, and housecleaner.  (*Id.* at 89.)

### 2.    **Medical Evidence**[4]

On April 14, 2011, Plaintiff presented to Las Colinas Medical Center (LCMC) with a back

_____

[4]Because the ultimate resolution of this case is based on Plaintiff's physical impairments, it is unnecessary to recite the psychological and psychiatric evidence.

injury. (doc. 14-1 at 698-700.) She reported that she fell at work, and a 300-pound box landed on her abdomen and left leg. (*Id.* at 699.) She complained of pain in her abdomen, lower back, and both wrists, mild pain upon weight bearing, and inability to walk. (*Id.*) She was alert, oriented, and displayed no acute distress, and physical examination was normal other than mild tenderness to the abdomen, back, both wrists, and upper left thigh. (*Id.* at 699-700.) X-rays of both wrists, right femur, L5 spine series, and pelvis were negative, and an abdomen CT scan was normal other, than a right ovarian cyst. (*Id.* at 700, 720-26.) Clinical impressions were sprain, contusion, and right ovarian cyst, and she was prescribed Vicodin for pain. (*Id.* at 700.)

On April 15, 2011, Plaintiff established treatment with Hector Gonzalez, D.O., for her back pain. (*Id.* at 732-37.) She reported mild, sharp pain to her back and right buttock, was unable to ambulate, and had difficulty standing. (*Id.* at 734.) She had tenderness and muscle rigidity in the lower back and pain radiation into the right buttock. (*Id.* at 735.) Dr. Gonzalez noted that she was tearful, exhibited symptom magnification, and was difficult to examine because she was non-cooperative. (*Id.*) He also noted that she refused to use a cane and instead requested a walker. (*Id.*) Dr. Gonzales assessed sprain lumbar region, muscle spasms, and sciatica, and administered a pain injection. (*Id.* at 736.) He opined that she would be able to return to work with the following restrictions: no standing, kneeling/squatting, bending/stooping, pushing/pulling, twisting, walking, climb stairs/ladders, overhead reaching, or lifting/carrying. (*Id.* at 737.)

Plaintiff attended six physical therapy sessions in April and May 2011. (*Id.* at 740-43, 749-52, 755-56.) On April 19, 2011, she had an antalgic gait with bilateral axillary crutches, needed crutches to support herself, and was positive for symptom magnification. (*Id.* at 741.) She was unable to heel/toe walk and squat and had limited lumbar spine range of motion, and straight leg

testing was positive on the left. (*Id.*) On May 5, 2011, she reported no pain relief from therapy and refused to attempt weight-bearing without crutches. (*Id.* at 752.) At her final therapy session on May 13, 2011, she had severe pain and diffuse tenderness to touch at pelvic area and could only tolerate three exercises. (*Id.* at 755.) The therapist noted that the treatments were ineffective at reducing pain and functional deficits. (*Id.*)

Plaintiff visited Dr. Gonzales nine times for treatment between April 19, 2011 and July 14, 2011. (*Id.* at 738-39, 744-45, 747-48, 753-54, 757-66, 771-72, 775-76.) At each appointment, she reported little pain improvement and continued to rely on crutches to ambulate. (*Id.*) Her pain was described as sharp in quality, mild in severity, and intermittent in frequency. (*Id.*) She exhibited abnormal posture or gait, tenderness, restricted range of motion of the back, positive straight leg raise test, and symptom magnification. (*Id.*) Dr. Gonzales opined that Plaintiff was able to return to work with the same restrictions recommended on April 15, 2011. (*Id.* at 738, 744, 747, 753, 757, 761, 765, 771, 775.)

On June 1, 2011, a lumbar spine MRI showed very subtle retrolisthesis with a 3-4 mm right paracentral disc protrusion and annular fissure contacting the right S1 nerve root, producing mild right subarticular recess. (*Id.* at 575.) On the same day, a sacrum/coccyx MRI revealed minimal edema involving the superior lateral aspect of the right sacral ala adjacent to the sacroiliac joint, which was suspicious for bone contusion. (*Id.* at 578.)

On June 8, 2011, Plaintiff presented to R. Craig Saunders, M.D., for an orthopedic consultation. (*Id.* at 767-70.) She had difficulty getting on and off the examination table and had pain on palpation for lumbar muscles. (*Id.* at 768.) She was unable to flex or extend on request and had painful range of motion of the hips and right leg. (*Id.*) Dr. Saunders diagnosed right sacral ala

contusion causing muscle pain in right buttock, retrolisthesis 4 mm at L5-S1, and annular fissure causing compression of right S1 nerve root. (*Id.*) He recommended epidural steroid injection for disc protrusion, right S1 nerve root radiculopathy, core exercises, and Lyrica for neuropathic pain. (*Id.*) He opined that Plaintiff's work injury would prevent her from returning to work until June 22, 2011, and that she be limited to light duty work with no lifting, sitting for two hours, and frequent breaks. (*Id.* at 768, 770.)

On June 22, 2011, Plaintiff presented to Dr. Saunders with back and right leg pain. (*Id.* at 773.) She had weakness on standing with the right foot, weakness plantar flexion of the right foot, and decreased ankle jerk on the right. (*Id.*) She had difficulty walking and continued to use crutches. (*Id.*) Dr. Saunders assessed L5-S1 right disc herniation, S1 radiculopathy with new onset right foot weakness, plantar flexion, and weakness of ankle jerk 1/4 on right and 2/4 on left. (*Id.*) He recommended lumbar epidural steroid injection, prescription refills for Lyrica, Hydrocodone, Flexeril, and Naproxen, and that Plaintiff remain off work. (*Id.* at 773-74.)

On July 27, 2011, Plaintiff returned to Dr. Saunders complaining of pain that she rated 10 out of 10 and numbness into both feet. (*Id.* at 781.) She reported being unable to stand, but could walk with no antalgic gait. (*Id.*) Her sitting straight leg raise test was negative, and no weakness in the right leg was observed. (*Id.*) Dr. Saunders noted that Plaintiff had disc bulge at L5-S1 with no improvement of symptoms with lumbar epidural injection. (*Id.*) He opined that surgery would not improve her back and leg pain, and released her from his care. (*Id.*)

Plaintiff returned to Dr. Gonzales on July 27 and August 10 and 24, 2011. (*Id.* at 779-80, 783-86.) She reported that her pain was worsening, but continued to describe the pain as sharp, mild, and intermittent. (*Id.* at 778, 784, 786.) She also would not ambulate without crutches. (*Id.*)

Dr. Gonzales assessed sprain lumbar region, other back symptoms, sciatica, and disc displacement. (*Id.* at 779, 783, 785.) He recommended that Plaintiff return to work with the following restrictions for her back: no kneeling/squatting, bending/stooping, pushing/pulling, twisting, climbing stairs/ladders, overhead reaching, or lifting/carrying and no more than two hours standing or walking. (*Id.*) On August 24, 2011, Dr. Gonzales opined that these restrictions were expected to last through September 7, 2011. (*Id.* at 785.)

On August 6, 2011, Plaintiff presented to David Gilbert, D.O., for a Designated Doctor Examination (DDE). (*Id.* at 651.) Dr. Gilbert opined that Plaintiff had reached clinical maximum medical improvement (MMI), and assigned her a 0 percent whole person impairment rating. (*Id.*) Dr. Gonzales agreed with Dr. Gilbert's certification of MMI and 0 percent impairment rating. (*Id.*)

On September 15, 2011, Plaintiff presented to Michael Holder, D.C., for an alternative impairment rating. (*Id.* at 507.) She reported constant pain in her lumbar region that was very sharp and burning and radiated into both legs. (*Id.*) She also had abdominal pain, constipation, and bladder control difficulties. (*Id.*) Dr. Holder noted decreased range of motion in the lumbar region due to pain and decreased sensation and paraesthesia at the right L5 and S1 dermatomal levels. (*Id.*) He assessed lumbar neuritis or radiculitis, lumbar disc displacement, myofascitis, abdominal pain, and other injury to trunk. (*Id.*)

Plaintiff was also examined by Voranart Kukai Sunakapakdee, D.C., for a functional capacity evaluation (FCE). (*Id.* at 616-30.) She reported intense pain when lifting less than 10 pounds and had difficulties with the tests for stooping, bending, kneeling, crouching, repetitive crouching, walking, climbing, standing, pushing and pulling due to pain. (*Id.* at 620.) Dr. Sunakapakdee noted that Plaintiff had difficulty with lumbar range of motion, and her "repetitive" biomechanical ability

was 10% of accepted norms. (*Id.* at 617.) She had extreme difficulty with lumbar pain while lifting less than 10 pounds, which indicated that she would be unable to safely perform various lifting maneuvers in a work environment. (*Id.*) Dr. Sunakapakdee noted that she displayed "excellent effort during strength examinations" and cooperated fully in all activities requested. (*Id.* at 617-18.) He recommended that Plaintiff not return to work because she did not meet the medium physical demand level required by her job. (*Id.* at 617.) Dr. Holder agreed that Plaintiff was unable to return to work. (*Id.* at 507.)

On September 21, 2011, Plaintiff presented for Nerve Conduction Velocity (NCV) and Electromyography (EMG) tests. (*Id.* at 569-74.) The NCV was abnormal because prolonged right sural latency indicated trauma or entrapment of the right sural nerve at the ankle. (*Id.* at 569.) The EMG was normal with no evidence of radiculopathy. (*Id.* at 570.)

On September 27, 2011, Plaintiff presented to Charles E. Willis, II, M.D., with low back pain radiating to the right leg. (*Id.* at 521-22.) She rated her pain 8/10 in intensity and stated that the pain limited her ability to work, exercise, and "have fun." (*Id.* at 521.) She reported increased pain with prolonged sitting, standing, walking, working, sleeping, and lifting. (*Id.*) Dr. Willis noted that she had conservative care, physical therapy, and manipulations, and she appeared moderately distressed with no signs of symptom magnification. (*Id.* at 521-22.) Physical examination showed 40% decreased range of motion of the lumbar spine, decreased sensation right lower extremity L5-S1 distribution, decreased reflex in right lower extremity patellar and Achilles, and decreased motor function right lower extremity 3/5. (*Id.*) She used crutches for assistance with ambulation, and her gait was antalgic. (*Id.* at 522.) Dr. Willis assessed chronic low back pain, lumbar disc displacement, lumbar radiculopathy, and urinary incontinence, and he recommended urology consultation for

incontinence and orthopedic consultation for possible back surgery. (*Id.*)

On October 7, 2011, Plaintiff presented to Francisco Batlle, M.D., for surgical consultation. (*Id.* at 514-16.) Dr. Batlle physically examined Plaintiff and noted decreased lumbar range of motion in forward flexion secondary to pain. (*Id.* at 515.) Her gait was antalgic, and she had marked difficulty with toe walking, less difficulty with heal walking, and difficulty with tandem walk "secondary to pain." (*Id.*) Straight leg raising was positive bilaterally at 45 degrees and sensory examination revealed hypoesthetic region in the L5 and S1 distributions on the right to pin prick and light touch. (*Id.* at 516.) Dr. Batlle assessed lumbar spondylolisthesis L5-S1 grade I, radiculopathy, herniated nucleus pulposus at L5-S1, mechanical/discogenic pain syndrome at L5-S1, and lumbago, and recommended epidural steroid therapy for symptomatic relief and further lumbar spine imaging for surgical determination. (*Id.*)

On October 13, 2011, Plaintiff returned to Dr. Willis for a follow-up visit. (*Id.* at 523-25.) She reported sharp, aching and shooting pain in the low back bilaterally that radiated into both legs, which precluded her from carrying out activities of daily living. (*Id.* at 523.) She exhibited an antalgic gait favoring the right side and decreased ranges of motion in the lumbar spine on all planes. (*Id.*) Palpation evaluation showed severe pain in the left and right iliolumbar group of the low back. (*Id.* at 524.)

On November 1, 2011, a lumbar spine MRI showed mild disc bulges at L4-L5 and L5-S1, moderate chronic T11-T12 discogenic degeneration, spinal canal widely patent throughout, and no significant neuroforaminal stenosis. (*Id.* at 529.)

On November 8, 2011, Plaintiff returned to Dr. Willis and reported some improvement with pain and sleep, but continued experiencing lower back pain. (*Id.* at 541.)

On November 23, 2011, Plaintiff presented to Dee Martinez, M.D., with severe lower back pain. (*Id.* at 534.) She reported her symptoms exacerbated when sitting or standing in one position for more than 10 minutes, and that she used crutches to walk. (*Id.*) Examination showed moderately restricted range of motion by 25% in lumbar flexion, extension, and lateral bending; decreased motor strength; diminished deep tendon reflex at the right ankle; and straight leg raising positive bilaterally at 75 degrees. (*Id.*) She walked with an antalgic gait and was unable to heel or toe walk. (*Id.*) Dr. Martinez opined that she required spinal surgery to alleviate her current symptoms because she had failed to respond to other forms of conservative medical care. (*Id.*)

On December 6, 2011, Plaintiff returned to Dr. Batlle for a follow-up. (*Id.* at 531-33.) She reported no significant improvement in symptomatology from epidural steroid therapy, and rated her pain as 9/10 that worsened after prolonged sitting, standing, coughing, sneezing, or Valsalva maneuver. (*Id.* at 531.) She also continued to experience intermittent urinary incontinence. (*Id.*) Dr. Batlle reviewed her November 1, 2011 lumbar spine MRI and opined that she would not benefit from surgery. (*Id.* at 532-33.) He recommended additional epidural steroid therapy and chronic pain management therapy. (*Id.* at 533.)

On December 7, 2011, a lumbar spine MRI appeared stable overall in comparison to the one on November 1, 2011. (*Id.* at 583.) It showed no acute fracture or subluxation and well-preserved intervertebral disc spaces with cholecystectomy clips present. (*Id.*) Mild dextro scoliotic curvature of the lumbar spine was considered positional in nature. (*Id.*)

On December 22, 2011, Plaintiff presented to Dr. Sunakapakdee for a second FCE. (*Id.* at 667-81.) She demonstrated lumbar range of motion and static strength improvements in her lumbar region since her first FCE in September 2011, but continued to experience problems with low back

pain and lumbar weakness. (*Id.* at 668, 670.) Dr. Sunakapakdee opined that Plaintiff was unable to work a 40-hour work week without pain because she could not occasionally lift, carry, push, or pull less than 10 pounds; crouch, knee, stoop, climb or repeat biomechanical movements; and stand or sit for prolonged periods. (*Id.* at 672.) He concluded that her current sedentary physical demand level precluded her from returning to her medium physical demand level job. (*Id.* at 667-68.)

On January 3, 2012, Plaintiff returned to Dr. Willis with lower back pain and right leg numbness. (*Id.* at 586.) Physical examination showed lumbar paraspinal tenderness with decreased range of motion, positive deficits to the right lower extremities at L5-S1 and motor deficits to the right lower extremities, antalgic gait, decreased reflex at the right Achilles, positive gowers, and positive straight leg raising. (*Id.*) Dr. Willis opined that it was medically necessary to perform a lumbar epidural steroid injection because Plaintiff had failed conservative treatment. (*Id.*) He performed this injection on January 20, 2012. (*Id.* at 576-77.)

On February 16, 2012, Plaintiff presented to John Pearson, D.C., for an alternative impairment rating. (*Id.* at 495-500.) Orthopedic lumbar evaluation showed positive tenderness to palpation at L5-S1; negative toe walk, heel walk, and sciatic notch; decreased range of motion; palpable muscle spasms; and positive bilateral straight leg raises. (*Id.* at 499.) Dr. Pearson assessed sciatica, abdominal contusion, and herniated disc at L5-S1, and recommended completion of the epidural steroid injection series. (*Id.* at 500.) He opined that Plaintiff had not reached MMI and was likely to reach MMI on or about May 18, 2012. (*Id.* at 495.)

On March 13, 2012, Frederick Cremona, M.D., a state agency medical consultant (SAMC), completed a physical RFC assessment based on the medical evidence. (*Id.* at 543-50.) Dr. Cremona opined that Plaintiff could lift and/or carry 10 pounds occasionally and less than 10 pounds

frequently; stand and/or walk (with normal breaks) for a total of two hours in an eight-hour workday; sit (with normal breaks) for a total of less than six hours in an eight-hour workday; push and/or pull without limitations, other than shown for lift and/or carry; occasionally climb ramps or stairs, but never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; and avoid even moderate exposure to hazards, with no manipulative, visual, or communicative limitations.  (*Id.* at 544-47.)  He also opined that Plaintiff's alleged severity of symptoms did not rise to listing levels.  (*Id.* at 548.)

On April 29, 2013, SAMC Randal Reid, M.D., completed a second physical RFC assessment for Plaintiff.  (*Id.* at 100-04.)  He opined that she could lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk (with normal breaks) for about four hours in an eight-hour workday; sit (with normal breaks) for about six hours in an eight-hour workday; push and/or pull without limitations, other than shown for lift and/or carry; occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds; unlimited balancing; and occasionally stoop, kneel, crouch, and crawl, with no manipulative, visual, communicative, or environmental limitations. (*Id.* at 102-03.)  Dr. Reid also opined that Plaintiff's physical RFC supported the maximum sustained work capacity for light work. (*Id.* at 104.)  On September 10, 2013, SAMC Yvonne Post, D.O., affirmed Dr. Reid's physical RFC assessment.  (*Id.* 111-13.)

### 3.    September 23, 2014 Hearing

On September 23, 2014, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ.  (doc. 14-1 at 52-75.)  Plaintiff was represented by an attorney.  (*Id.* at 52.)

#### a.    *Plaintiff's Testimony*

Plaintiff testified that she had no education beyond completion of the third grade in Mexico

and had little ability to read and write in Spanish. (*Id.* at 57-58.) She lived with her 11-year old twin daughters. (*Id.* at 58.) Her last full-time job was with Fed-Ex until she was injured on the job in 2011. (*Id.* at 58-59.) She began working part-time for Fed-Ex separating packages, which required her to carry packages and to stand and walk the whole time, in early 2009, and switched to full-time in 2010. (*Id.* at 59-60.) She also pulled packages weighing up to 300 pounds and knocked off packages that were too heavy to carry. (*Id.*) From 1997 to 1998, she worked on an assembly line at Atrium Windows, where she used her feet to pump the machine making holes in the parts of windows for assembly. (*Id.* at 60-61.) From 1998 to 2000, she was self-employed caring for up to four children at her home. (*Id.* at 61.)

On April 14, 2011, she injured herself while working at Fed-Ex and went to the emergency room the same day for treatment. (*Id.* at 61-62.) The hospital conducted studies for her back and legs and gave her pain medication and crutches. (*Id.* at 62.) She used the crutches for a year and a half, but did not remember exactly when she finished using them. (*Id.*) She was still being treated for injuries related to the work-related accident and still needed to take five different pain medications every night, although she did not remember their names. (*Id.* at 59, 62-63.) Plaintiff sometimes took Hydrocodone in the mornings if she had a lot of pain. (*Id.*) If she took her pain medication the night before, she could do some cooking and washing, but her older daughter had to handle the heaviest stuff around the house. (*Id.* at 63-64.) Every day she went to appointments with her daughters and then took them to school. (*Id.*) She cooked and washed dishes, but was unable to do the stuff she did before. (*Id.* at 64.) She could watch television for 20 minutes, but needed to walk around or to lay down for another 20 minutes. (*Id.*) Her last back injection was in May or July of 2014, which provided some pain relief for a month. (*Id.*) In 2012, she tore the

ligaments in her right hand and was prescribed the same pain medication for her back pain. (*Id.* at 66.)

Plaintiff had been using crutches for a year and a half because she lacked strength in her legs, and full weight on her legs made her cry. (*Id.* at 66-67.) If she had increased back pain, she needed to use the cane issued to her by Parkland, which she used two to three times a week depending on her pain, and she agreed that it was needed because of her work injury at Fed-Ex. (*Id.* at 67.) She wore the same back brace a doctor gave her in 2011, which helped because her feet did not function well. (*Id.* at 68.) She had been unable to pick up anything heavy or to work anywhere since her accident. (*Id.*) In 2011, she was unable to walk around the house and needed someone to help her get out of bed. (*Id.* at 68-69.) At that time, she could only walk for about four minutes before needing to lie down, and her pain worsened while sitting. (*Id.* at 69.) Since 2011, her back pain had level remained the same, except she no longer used crutches. (*Id.*) She drove less than once a week and only when she went to medical appointments or the store, and she did not drive in 2011. (*Id.* at 69-70.)

### b.    VE's testimony

The VE testified that Plaintiff had previous work experience as a parcel post clerk, which was heavy work with a SVP of 3, as a unit assembler, which was medium work with a SVP of 4, and a child monitor, which was medium work with a SVP of 3. (*Id.* at 72.) A hypothetical individual with the same age, marginal education, and work history as Plaintiff would not be able to sustain her prior work with the following limitations: lift and/or carry 20 pounds occasionally and 10 pounds frequently; sit and stand/walk six hours in an eight-hour workday with normal breaks; sit/stand option with ability to change positions every 30 to 45 minutes to relieve pain or discomfort;

occasionally climb ramps or stairs; never climb ladders, ropes, or scaffolds; occasionally stoop, kneel, crouch, and crawl; frequently balance; and understand, remember, and carry out simple instructions and perform simple tasks. (*Id.* at 72-73.) There was other available work that the hypothetical person could perform, including ticket seller (light and SVP-2) with one million jobs nationally; office helper (light and SVP-2) with 100,000 jobs nationally; and mail clerk (light and SVP-2) with 70,000 jobs nationally. (*Id.* at 73.) If the same hypothetical person was further limited to occasional use of an assistive device for ambulation, and occasional use of right upper extremity for reaching, handling, or grasping, she would be precluded from these jobs. (*Id.* at 73-74.) A person unable to consistently and effectively communicate in English, both speaking and reading, would also be precluded from these jobs. (*Id.* at 74.) The VE's testimony was consistent with the DOT, except the sit/stand and cane limitations were based on his professional opinion. (*Id.*)

### 4.     June 7, 2017 Hearing

On remand, Plaintiff and the VE testified at a second hearing before the ALJ on June 7, 2017. (doc. 14-1 at 76-97.) Plaintiff was represented by an attorney. (*Id.* at 76.)

#### a.     *Plaintiff's Testimony*

Plaintiff testified that she lived with her two 14-year old daughters, drove herself to the hearing, and would drive her daughters to school and their appointments during the week. (*Id.* at 81.) She never went to school, but went to a local college for two to three months to learn how to read. (*Id.* at 82-83.) She could read and write "a little bit" in Spanish. (*Id.* at 83.) She could not read or speak any English and could only understand a little bit of English. (*Id.* at 83, 87-88.) In 1997, she worked on the assembly line at Atrium Windows and had various duties including assembling, cleaning windows, and sweeping. (*Id.* at 83.) She received instructions by someone demonstrating

the tasks. (*Id.*) From 2000 to 2002, she washed dishes and prepared salads at a local school district. (*Id.* at 84.) She cleaned homes and babysat, off and on, from 1998 to 2011. (*Id.*) In 2010 and 2011, she worked at Fed-Ex, separating packages coming in on the line. (Id.)

While working at Fed-Ex, Plaintiff pulled a 400-pound box that came loose, fell on top of her, and knocked her over. (*Id.* at 84-85.) During the period between the accident and December 2011, she was only able to walk 10 to 15 minutes without assistance and would then need to lie down on the bed. (*Id.* at 85.) After her accident, she had ion issues, where urine came out every time she laughed or coughed. (*Id.* at 86.) She had surgery correcting the problem two years ago. (*Id.*) She was not the same since the accident and felt worse as time went by; her legs and buttocks would numb and tingle, and her pain was worsening. (*Id.* at 86-87.) She was unable to lift anything with her right hand, and immediately after her accident, she could only lift less than ten pounds. (*Id.* at 87.)

### b. *VE's testimony*

The VE testified that Plaintiff had previous work experience as a housecleaner, which was light work with a SVP of 2, as an assembly line worker, which was medium work with a SVP of 2, and as a package sorter, which was medium work with a SVP of 2. (*Id.* at 89.) A younger individual who was illiterate and did not speak English would not be able to sustain Plaintiff's prior work with the following limitations: lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and walk six hours in an eight-hour workday; sit six hours in an eight-hour workday with an option to change positions every 30 to 45 minutes; occasionally climb ramps or stairs, but never climb ladders, ropes, or scaffolds; occasionally stoop, kneel, crouch, and crawl; frequently balance; and understand, remember, and carry out simple instructions and perform simple tasks. (*Id.* at 90.)

There was other available work that the hypothetical person could perform, all sedentary with a SVP of 2, including lens inspector with 16,000 jobs nationally; film inspector with 22,000 jobs nationally; and clothing inspector with 70,000 jobs nationally. (*Id.* at 91.) Lens inspector and film inspector both had a reasoning level of two, while a clothing inspector had a reasoning level of one. (*Id.* at 92.) These jobs would not tolerate unscheduled daily bathroom breaks for incontinence. (*Id.* at 92-93.) They did not require interaction with the public or coworkers, but required the ability to stay on task for at least two hours in duration. (*Id.* at 93-95.)

## C. ALJ's Findings

The ALJ issued her decision denying benefits on October 25, 2017. (doc. 14-1 at 28-40.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the period from her alleged onset date of April 1, 2011 through her date last insured of December 31, 2011. (*Id.* at 30.) At step two, the ALJ found that she had the following severe impairments: L5-S1 right disc herniation with S1 radiculopathy and grade I lumbar spondylolisthesis. (*Id.*) Despite those impairments, at step three, the ALJ found that Plaintiff had no impairment or combination of impairments that met or equaled the severity of one of the impairments listed in the social security regulations. (*Id.* at 33.)

Next, the ALJ determined that Plaintiff retained the RFC to perform less than the full range of sedentary work, and included the following limitations: lift and/or carry 20 pounds occasionally and 10 pounds frequently; sit for six hours in an eight-hour workday; stand and/or walk for four hours in an eight-hour workday with the option to sit or stand every 30 to 45 minutes to change positions; occasionally climb ramps or stairs, but never climb ladders, ropes, or scaffolds; frequently balance; occasionally stoop, kneel, and crawl; and understand, carry out, and remember only simple

instructions and perform only simple tasks due to preoccupation with pain. (*Id.* at 33-34.)

At step four, the ALJ determined that Plaintiff was unable to perform any past relevant work. (*Id.* at 38.) At step five, the ALJ found that transferability of job skills was not an issue because Plaintiff's past relevant work was unskilled, but considering her age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that she could perform. (*Id.* at 38-39.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, from April 1, 2011, the alleged onset date, through December 31, 2011, the date last insured. (*Id.* at 39.)

## II.  LEGAL STANDARD

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program

is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). The relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are also identical to those governing the determination under a claim for supplemental security income. *See id*. Courts may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id*.

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be

performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

## III. RESIDUAL FUNCTIONAL CAPACITY

Plaintiff presents only one issue for review: "The ALJ's RFC finding is not supported by substantial evidence." (doc. 21 at 1.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations. 20 C.F.R. § 404.1545(a)(1). The RFC determination is a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1378, 1386-87 (5th Cir. 1988) (per curiam). It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). An individual's RFC should

be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources.  20 C.F.R. at § 404.1545(a)(3); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity."  *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985).  The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists.  *See* SSR 96-8p, 1996 WL 374184, at *1.  The ALJ's RFC decision can be supported by substantial evidence even if she does not specifically discuss all the evidence that supports her decision or all the evidence that she rejected.  *Falco v. Shalala*, 27 F.3d 160, 163-64 (5th Cir. 1994).  A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record.  *Leggett*, 67 F.3d at 564.

Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings."  *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted).  The Court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision.  *Id*.  Courts may not reweigh the evidence or substitute their judgment for that of the Secretary, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence."  *See Johnson*, 864 F.2d at 343 (citations omitted).

Plaintiff argues that the medical record "indicates [her] impairments [are] significantly more

limiting than accounted for by the ALJ and restrict [her] functional abilities to such an extent that she is unable to perform the lifting, carrying, sitting, standing, walking, and persistence requirements of any work on a sustained basis without excessive breaks." (doc. 21 at 4-5.)

Here, the ALJ determined that Plaintiff had the RFC to perform less than the full range of sedentary work, except she could lift and/or carry 20 pounds occasionally and 10 pounds frequently; sit for six hours in an eight-hour workday; stand and/or walk for four hours in an eight-hour workday with the option to sit or stand every 30 to 45 minutes to change positions; occasionally climb ramps or stairs, but never climb ladders, ropes, or scaffolds; frequently balance; occasionally stoop, kneel, and crawl; and understand, carry out, and remember only simple instructions and perform only simple tasks due to preoccupation with pain. (*See* doc. 14-1 at 33-34.) She explained that she assessed the RFC based on the entire record and had "considered all symptoms and the extent to which these symptoms [could] reasonably be accepted as consistent with the objective medical evidence and other evidence" including opinion evidence. (*Id.*) She noted and directly considered the treatment records, imaging studies, the FCEs, and the opinions of Drs. Gonzales, Saunders, Gilbert, Holder, and the SAMCs. (*Id.*)

Dr. Gonzales' treatment notes exhibited lumbar muscle spasms, tenderness, limited range of motion, difficulty getting off the examination table, right leg weakness, decreased reflexes and sensation on the right, an antalgic gait with crutches, and positive straight leg raises. (*Id.* at 35.) The ALJ noted that while these neurological deficits were observed during examination, there was also symptom magnification shown, "which casts significant doubt upon the legitimacy of these physical examination deficits." (*Id.*) Additionally, Plaintiff's imaging showed "rather benign deficits," which further suggested that her lumbar spine impairment was not as severe as her physical

examinations suggested. (*Id.*) She also referenced the "normal" April 2011 lumbar spine x-ray; the June 2011 lumbar MRI showing "very subtle retrolisthesis" and "mild right subarticular recess;" the September 2011 "abnormal" NCV and "normal" EMG; and the November 2011 CT myelogram showing "mild disc bulging." (*Id.*) Nevertheless, she determined that they were "inconsistent with the existence of a debilitating impairment and with the extent of physical examination deficits exhibited." (*Id.*)

The ALJ also noted that Plaintiff's FCEs by Dr. Sunakapakdee in September 2011 and December 2011 found more restricted exertional capacities, but they did not consider the "consistent findings of malingering." (*Id.* at 35-36.) She acknowledged that while the frequency of treatment appeared consistent with allegations of disability, this was outweighed by her conservative treatment, including epidural steroid injections, pain management, and physical therapy. (*Id.* at 37.)

The ALJ considered Dr. Gonzales' opinions from April 2011 through August 2011, that Plaintiff could not perform work during therapy or could only stand and walk for two hours without lifting, but noted that Dr. Gonzales endorsed Dr. Gilbert's August 2011 opinion that she could return to work without restrictions. (*Id.* at 37.) She found this opinion consistent with Dr. Saunders' July 2011 opinion that Plaintiff was able to return to work. (*Id.*) The ALJ gave "some weight" to these opinions because they were "consistent with one another and were rendered by doctors who had treated the claimant on numerous occasions since April 2011." (*Id.*) She also referenced Dr. Holder's September 2011 opinion that Plaintiff was unable to return to work, but assigned it "less weight" because it was inconsistent with the other opinions, was based on a single examination, and

because Dr. Holder was a chiropractor and not "an acceptable medical source."[5]  (*Id.*)

The ALJ also considered the SAMC opinion of Dr. Cremona who opined that Plaintiff could perform a modified range of sedentary work, as well as the SAMC opinions of Drs. Reid and Post who both opined that Plaintiff could perform a modified range of light work, but assigned greater weight to the opinions of Drs. Reid and Post because "their opinions [were] more consistent with [Plaintiff's] conservative treatment, her reports of only mild or minimal symptoms occurring only intermittently, and the consistent signs of malingering." (*Id.* at 37-38.)

In addition to objective medical evidence, the ALJ identified other evidence she considered when assessing the consistency of Plaintiff's statements on the intensity, persistence, and limiting effects of her symptoms with the medical evidence in accordance with 20 C.F.R. § 404.1529 and SSR 16-3p. (*Id.* at 34, 37.)  The ALJ referenced Plaintiff's treatment records and the fact she had consistently endorsed the same type of symptoms, but noted that she did not describe debilitating symptoms to her doctors and "typically endorsed only mild or minimal pain on only an intermittent basis." (*Id.* at 37.)  The ALJ also noted Plaintiff's testimony that she was "worse" in 2013 than she had been in 2011, but that she had still endorsed limitations in 2011 of not driving, needing to lie down sometimes, and requiring breaks when cooking and doing household chores.  (*Id.* at 37.) Nevertheless, the ALJ determined that these limitations supported a limitation in Plaintiff's ability to stand and/or walk with a sit-stand limitation, "but they [were] inconsistent with debilitating limitations."  (*Id.*)  She concluded that the RFC was supported by the objective medical evidence,

---

[5]Federal regulations applying to claims filed before March 27, 2017, distinguished between evidence from "acceptable medical sources," which includes licensed physicians, licensed psychologists, licensed podiatrists, and qualified speech-language pathologists, and evidence from "other sources," which includes non-acceptable and non-medical sources. *See Buchanan v. Berryhill*, No. 3:15-CV-3287-BH, 2017 WL 998513, at *8 (N.D. Tex. Mar. 14, 2017) (citing 20 C.F.R. § 404.1513).  Nurse-practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists are examples of "other medical sources." *See* 20 C.F.R. § 404.1513(d)(1) (2012).

"particularly, the imaging and signs of malingering; the claimant's reports of mild symptoms to treating sources; and the claimant's conservative treatment." (*Id.* at 38.)

Substantial evidence exists to support the ALJ's RFC assessment, as the ALJ considered the medical evidence in the record, including the treatment records, as well as the opinions of Plaintiff's treating physicians and the SAMCs. Because the disability determination falls within the purview of the ALJ, she could give some weight to the opinions of Drs. Gonzales, Gilbert, and Saunders, and give greater weight to the opinions of SAMCs Drs. Reid and Post than that of SAMC Dr. Cremona, if she found them to be better supported by the evidence. *See Frank*, 326 F.3d at 620; *see also Oldham v. Schweiker*, 660 F.2d 1078, 1084 (5th Cir. 1981) ("[T]he ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion."); 20 C.F.R. § 404.1527(f)(1). Additionally, the ALJ properly considered the opinions of chiropractors Drs. Holder and Sunakapakdee by giving them little weight in her decision. *See Porter v. Barnhart*, 200 F. App'x 317, 319 (5th Cir. 2006) (holding that an ALJ did not err by refusing to find limitations based upon a functional capacity evaluation from a chiropractor because "the ALJ was not required to rely on the chiropractor's evaluation in making the RFC finding because a chiropractor is not an acceptable medical source" and other medical evidence did not show significant functional limitations). As the fact-finder, the ALJ had the sole responsibility for determining whether Plaintiff's testimony regarding her alleged symptoms and functional limitations conflicted with other statements she made and with other evidence in the record. *See Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991) (per curiam); *see also Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000) ("Conflicts in the evidence are for the [ALJ] . . . to resolve.").

Plaintiff argues that the medical evidence in the record support "greater restrictions resulting

from [her] injury prior to her [date last insured]." (doc. 21 at 6.)  In support, Plaintiff references the February 16, 2012 examination by Dr. Pearson, who opined that Plaintiff had not yet reached MMI as of February 16, 2012, and was likely to reach it by May 18, 2012.  (*Id.*)  The Fifth Circuit has long recognized that "[r]etrospective medical diagnoses constitute relevant evidence of pre-expiration disability, and properly corroborated retrospective medical diagnoses can be used to establish disability onset dates."  *Likes v. Callahan*, 112 F.3d 189, 191 (5th Cir. 1997).  To be relevant, the retrospective opinion cannot simply express an opinion on the claimant's current status; it must clearly reference the relevant period of disability. *McLendon v. Barnhart*, 184 F. App'x 430, 432 (5th Cir. 2006) (citing *Likes*, 112 F.3d at 191; *Ivy v. Sullivan*, 898 F.2d 1045 (5th Cir. 1990)).  Here, there is no evidence the MMI assessment by Dr. Pearson referred to anything but her current condition.  (*See* doc, 14-1 at 495-500.)  Because Dr. Pearson did not proffer a retrospective opinion, his opinion was not relevant and did not need to be considered by the ALJ. *See McLendon*, 184 F. App'x at 432.[6]

The ALJ considered the medical evidence in the record.  As the trier of fact, she was entitled to weigh the evidence against other objective findings, including the opinion evidence available and the record as a whole.  *See Walker v. Barnhart*, 158 F. App'x 534, 535 (5th Cir. 2005) (citing *Newton*, 209 F.3d at 458).  Accordingly, a reviewing court must defer to the ALJ's decisions.  *See Leggett*, 67 F.3d at 564.  Because the ALJ relied on medical evidence in the record in making her RFC determination, her assessment was supported by substantial evidence.  *See Greenspan*, 38 F.3d at 236 (noting in applying the substantial evidence standard, a reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment).  To the extent that Plaintiff complains of

---

[6]Further, Dr. Pearson's opinion is not entitled to special weight because he is a chiropractor and not an acceptable medical source under the applicable regulations.  *See Porter*, 200 F. App'x at 319.

the failure to include more restrictive limitations in the RFC, the ALJ did not err, and remand is not required on this basis.

## IV.  CONCLUSION

The Commissioner's decision is **AFFIRMED**.

**SO ORDERED**, on this 19th day of March, 2020.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE